IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2014

## STATE OF TENNESSEE v. QUINCEY BERNARD DOTSON

**Appeal from the Criminal Court for Madison County**
**No. 13-399     Roy B. Morgan, Jr., Judge**

**No. W2013-02058-CCA-R3-CD  -  Filed August 13, 2014**

The defendant, Quincey Bernard Dotson, was convicted by a Madison County Criminal Court jury of aggravated assault, a Class C felony, and sentenced to a term of ten years as a Range II offender in the Tennessee Department of Correction. On appeal, he challenges the sufficiency of the evidence and the trial court's failure to apply any mitigating factors in determining his sentence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jeremy B. Epperson, Assistant Public Defender, for the appellant, Quincey Bernard Dotson.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Rolf G.S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for two counts of aggravated assault arising out of a domestic disturbance with his wife at the time, Lisa Hunnicutt Dotson, the victim. The first count charged the defendant with attempting or intending to cause bodily injury by strangulation. The second count charged the defendant with displaying or using a gun to cause fear of imminent bodily injury.

## State's Proof

The victim testified that the defendant was her ex-husband and that they had been married for five years. On January 8, 2013, the victim, the defendant, and their seven-month-old child were in their apartment in Madison County. When the victim returned home from work at 11:00 p.m., she fed their daughter and put her to bed. The defendant went to bed about thirty minutes after the victim got home. After the defendant fell asleep, he received a text message on his cell phone, and the victim read it. The text was from another woman, and the conversation appeared to be adulterous in nature. The victim woke up the defendant, threw his phone at him on the bed, and asked him to talk. The victim was upset because this was not the first time that this had occurred.

The victim testified that she went into the bathroom and shut the door, but the defendant "barged" in, slammed the door, and started yelling. The defendant made up stories about who the woman was, and they began to argue. The verbal argument turned into a physical fight, and the defendant threw the victim against the wall and began to choke her. The victim fought back, and the defendant threw the victim into the bathtub causing her to hit her spine on the soap dish. Once she was able to get out of the bathtub, the victim confronted the defendant again, and their altercation spilled into the hallway. The defendant hit the victim repeatedly from her head to her feet, leaving scars on her arms. He hit her face, head, chest, back, and sides. The victim said that the defendant then pulled out a pistol, placed it against her cheek, and told her that he was going to kill her. Their daughter started screaming because of the commotion, so the victim went to comfort her. The victim told their daughter that she would not have to worry about seeing them argue again because she intended to leave the defendant.

The victim testified that, as she comforted her daughter, the defendant came into the room and said that he would help, pointing his gun to his chin as though he intended to kill himself in front of their daughter. The victim told the defendant to leave, and he responded, "No, let her see it." The victim slammed the door shut, not knowing if the defendant really intended to commit suicide. The defendant kept trying to push the door open, but the victim was able to hold it closed. The defendant then grew quiet for a few minutes, and the victim did not know whether he had killed himself or left. She slowly opened the bedroom door and saw the defendant in the bedroom packing his belongings into their daughter's diaper bag. The victim was upset that the defendant was using their daughter's bag, and they argued about that. The defendant grabbed the victim's cell phone to prevent her from calling the police. The victim grabbed a liquor bottle to defend herself. The defendant turned toward the dresser, shot his gun into the floor, and ran down the stairs. The victim asked for her house key and phone, and the defendant told her that they were "long gone." As the defendant left the apartment, he threw the victim's cell phone into the living room, breaking

it into three pieces. The victim was able to put the phone back together and call the police.

The victim testified that, after the altercation, her arm was swollen and she thought that it was broken at first. She had scratch marks from the defendant's fingernails that left scars, as well as bruised ribs. She also had bruising around her neck from where the defendant choked her. She went to the emergency room and received a CT Scan and X-rays to check for broken bones. It was discovered that the victim had a mild concussion from where her head hit the bathtub.

With regard to the strangulation, the victim testified that the defendant strangled her "more than once. It happened in the bathroom and in the hallway." The defendant had "both his hands wrapped around [her] neck." With regard to the defendant's firing a gun, the victim testified that she was standing in the doorway when he did so, and that he shot the floor. The victim was scared that she or her daughter would be killed. The victim admitted that she hit the defendant during the altercation but maintained that he hit her first.

On cross-examination, the victim said that she became more afraid of the defendant as their argument escalated. The victim acknowledged that her arm was not broken, even though she thought that it was at first. The victim admitted that she hit the defendant on the head with the liquor bottle. She also admitted that she hit the defendant with a closed fist but said that she was defending herself.

Officer Michael Byrd with the Jackson Police Department testified that he responded to a domestic dispute call in this case. He was advised that a gun had been fired. Officer Byrd proceeded to the apartment and spoke with the victim, who told him that her husband, the defendant, had assaulted her. The victim told Officer Byrd that she and the defendant had a confrontation because the defendant had been unfaithful and that the argument became physical. The victim told Officer Byrd that the defendant "had strangled her and punched her several times." Officer Byrd observed marks on the victim's body that matched her story.

Officer Byrd testified that the victim told him the altercation started in the bathroom and spilled into the hallway. She said that, when she went into the baby's room, the defendant pointed a gun at her and said, "I'll kill you, bitch." Thereafter, the defendant pointed the gun at himself and said, "[Our daughter] won't have to go through this anymore[.]" The victim told Officer Byrd that the defendant moved to the bedroom and that she followed him while they argued. During the argument, the defendant fired a shot into the floor. Officers took a photograph of the floor that showed where a bullet ricocheted off the floor. The officers were unable to locate the bullet.

Officer Byrd testified that the victim's face was red and swollen, consistent with

having been hit. He also observed bruising and redness around the victim's neck. The victim had scratches on her upper left arm, which were deep and bleeding. Her arms appeared to be bruised. Officer Byrd believed that the victim's injuries were consistent with what she told him had happened. The defendant had already fled on foot when the officer arrived, and the police put out a "be on the lookout" notice for the defendant. The defendant was later apprehended.

Officer Byrd acknowledged that no gun, bullet, or shell casing was recovered from the scene. He also acknowledged that the apartment complex in which the incident took place was an area where numerous shootings had taken place over the years. Officer Byrd agreed that no witnesses confirmed hearing a gunshot that night. Officer Byrd thought that the victim's injuries and the bullet hole were consistent with the version of events related by the victim.

Lyntory Hamlin, the defendant's sister, testified as a witness for the defense. Hamlin stated that, at the time of the incident, she had known the victim for three and a half years. Hamlin said that she spoke with the victim about the incident and that the victim said she woke up the defendant by hitting him over the head with a liquor bottle. Hamlin also said the victim had a reputation in the community for being dishonest and had lied to Hamlin before.

The victim was called in rebuttal and denied that she started the altercation by hitting the defendant on the head with a liquor bottle.

Following the conclusion of the proof, the jury found the defendant guilty of aggravated assault as charged in count one and found him not guilty of aggravated assault as charged in count two.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first argues that the evidence is insufficient to sustain his conviction. He asserts that, although the victim testified that he choked her, there were no eyewitnesses and no evidence that he impeded her normal breathing or circulation of blood by applying pressure to her throat or neck or by blocking her nose or mouth.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ( "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [w]as intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(iv). "Strangulation" is defined as "intentionally impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person." Id. § 39-13-102(a)(2).

In the light most favorable to the State, the victim testified that a verbal argument between her and the defendant escalated into a physical fight, during which the defendant

threw the victim against the wall and began to choke her. The victim testified that the defendant strangled her again in the hallway. The victim described that the defendant had "both his hands wrapped around [her] neck." The victim's depiction of the attack clearly describes the application of pressure to her throat or neck. After the police arrived, the victim relayed a consistent description of the events, including the defendant's strangling her. The officer believed that the victim's physical injuries, which included bruising and redness around her neck, were consistent with her description of the defendant's strangling her. The victim's testimony and her resulting physical injuries provide ample evidence to support the defendant's conviction for aggravated assault. The credibility of the victim's testimony was assessed by the jury as the trier of fact and is not for us to second-guess on appeal. Thus, the evidence is sufficient for a rational trier of fact to find that the defendant committed aggravated assault.

## II. Sentencing

The defendant also challenges the sentence imposed by the trial court. He asserts that the trial court failed to apply any mitigating factors in determining his sentence.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Again, the defendant contends the trial court failed to "properly" apply three mitigating factors: that he acted under strong provocation, that substantial grounds exist tending to excuse or justify his conduct though failing to establish a defense, and that he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(2), (3), and (11).

The trial court conducted a sentencing hearing, at which the State and defense made arguments concerning the applicable enhancement and mitigating factors, respectively. In determining the defendant's sentence, the trial court noted that it considered the entire record, the defendant's presentence report, the evidence presented at trial, the principles of sentencing, the nature and characteristics of the criminal conduct, the arguments of counsel, and the enhancement and mitigating factors. As to enhancement factors, the trial court found that the defendant had a prior criminal history, including driving offenses in May of 2012 and facilitation of especially aggravated kidnapping in 2009. See Tenn. Code Ann. § 40-35-114(1). The court also found that the defendant failed to comply with the conditions of a sentence involving release into the community, as he was on probation for the especially aggravated kidnapping conviction at the time of the present offense. See id. § 40-35-114(8). The trial court further determined that the defendant was released on parole or probation at the time of the offense. See id. § 40-35-114(13). Thereafter, the trial court stated that it considered the mitigating factors submitted by the defendant, as well as "the catchall" factor, but did not find that any were applicable. We have reviewed the record and conclude that it supports the determination of the trial court that these mitigating factors were not applicable or, even if they were, the sentence would not have been affected.

The record reflects that the trial court imposed the ten-year sentence after proper consideration of the purposes and principles of our sentencing act and consideration of proposed enhancement and mitigating factors. See Bise, 380 S.W.3d at 706. We conclude, therefore, that the trial court did not abuse its discretion in sentencing the defendant to ten years as a Range II offender for his aggravated assault conviction.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgement of the trial court.

_____
ALAN E. GLENN, JUDGE